## TALCOTT v. STANDARD OIL CO. et al.

(Supreme Court, Appellate Division, First Department. March 22, 1912.)

1. CORPORATIONS (§ 112*)—CERTIFICATE—"NEGOTIABLE INSTRUMENT."
    A certificate of stock is not a "negotiable instrument."

    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 464, 465; Dec. Dig. § 112.*

    For other definitions, see Words and Phrases, vol. 5, pp. 4767–4770; vol. 8, p. 7731.]

2. CORPORATIONS (§ 126*)—ASSIGNMENT OF CERTIFICATE—BLANK ASSIGNMENT.
    An assignment and power of attorney indorsed upon the back of a certificate of stock, although in blank except as to signature and witness, present such indicia of title that an innocent assignee thereunder obtains good title; and the same rule applies where the assignment and power, though upon a separate paper, identify by description the property intended to be conveyed.

    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 474, 475; Dec. Dig. § 126.*]

3. CORPORATIONS (§ 149*)—ASSIGNMENT OF CERTIFICATE—BONA FIDE ASSIGNEE
    —ESTOPPEL TO DENY TRANSACTION.
    The owner of stock delivered the certificate to his brother-in-law as security for a purchase of stock to be made by him for the owner's benefit, and thereafter the brother-in-law purchased stock as agreed, and without knowledge of the owner attached to the certificate a blank power of attorney which had been delivered by the owner at a previous time for a different purpose and sent it to his broker as collateral, and the broker gave a usual collateral stock note for a loan and accompanied it with the certificate, to which the power of attorney in blank was pinned, signed by the owner, although not describing the property. After the broker's failure, the corporation issuing the certificate, on notification of the owner, refused to make the transfer. Held, in an action by the party advancing on the collateral to be adjudged the absolute owner, that, as the brokers were entitled to rely on the bona fides of the transaction, and as the conduct of the owner had made the transaction pos-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sible, he was estopped from setting up any right or title therein against a bona fide assignee.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 539–546; Dec. Dig. § 149; Pledges, Cent. Dig. § 49.]

4. CORPORATIONS (§ 149*)—ASSIGNMENT OF CERTIFICATE—DELIVERY FOR LIMITED PURPOSE—BONA FIDE ASSIGNEE.

An agent to whom the owner has delivered a certificate of stock, duly indorsed for transfer with a limited power of disposition for a special purpose, may change the title thereto as against the true owner by transferring it to a bona fide transferee without notice of the limitations of the agent's authority, although the transfer is made for an unauthorized purpose and with the intention on the part of the agent to commit a fraud on his principal.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 539–546; Dec. Dig. § 149.*]

Laughlin and Miller, JJ., dissenting.

Appeal from Special Term, New York County.

Action by James Talcott against the Standard Oil Company and William S. Blakslee. From a judgment of Special Term, entered on a decision and dismissing the complaint, plaintiff appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and MILLER, JJ.

Harris & Harris (Edward W. Harris, of counsel, and Robert D. Ireland, on the brief), for appellant.

Kellogg & Emery (Frederic R. Kellogg, of counsel, and Chester O. Swain, on the brief), for respondent Blakslee.

CLARKE, J. Plaintiff, claiming to be the owner of 25 shares of the capital stock of the Standard Oil Company standing in the name of the defendant William S. Blakslee, brought this suit against the said company and the said Blakslee praying that he be adjudged the owner, that the claim of the latter to any interest in the stock be dismissed as unfounded, and that the defendant company be required to transfer the stock to plaintiff on its books. The position of the company is that of a mere stakeholder. The Special Term has held that the defendant Blakslee is the sole owner of the said certificate; that the plaintiff has no right, title, or interest therein; that he be directed to forthwith surrender and deliver the same to the defendant Blakslee; and that the complaint be dismissed upon the merits, with costs to each of the defendants. From said judgment plaintiff appeals.

The plaintiff is a banker and commission merchant in the city of New York. William E. Nichols & Co. were stockbrokers to whom the plaintiff had been making loans for several years. On November 8, 1907, Nichols & Co. called up the plaintiff on the telephone and asked if he would make a loan on 25 shares of the capital stock of the Standard Oil Company to the extent of 75 per cent. of the market value thereof, which plaintiff agreed to do. Accordingly, on said day Mr. Talcott loaned $7,500 to Nichols & Co., who delivered to him the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

usual collateral stock note bearing said date and reading in part as follows:

"On demand, after date, for value received, we hereby promise to pay to James Talcott, or order, at —— seventy-five hundred dollars, with interest at the rate of —— per cent. per annum until paid, having deposited herewith, as collateral security, for the payment of this note, and also as collateral security, for all other present or future demands of any and all kinds of the holder hereof against the undersigned due or not due, the following property, viz., 25 Standard Oil, $10,000"

—and delivered at the same time a certificate of the Standard Oil Company for 25 shares made out in the name of W. S. Blakslee. Pinned thereto, accompanying therewith, and delivered at the same time, was an assignment and irrevocable power of attorney in blank. That is, neither the name of the assignee nor the description of the property assigned was entered in the body of the instrument. This was signed as follows:

"In witness whereof, I have hereunto set my hand and seal the 18th day of October, one thousand nine hundred and seven.
                                        "W. S. Blakslee.   [L. S.]
"Signed, sealed and delivered in presence of W. A. Ashbaugh.
"Signature guaranteed.                    William E. Nichols & Co."

Previous to Mr. Talcott's loan and on the 18th of October, 1907, the Empire Trust Company of the City of New York had loaned William E. Nichols & Co. the same amount, $7,500, on the same certificate of stock, accompanied by the same assignment and power of attorney, and before delivering the assignment with stock power to the Empire Trust Company, Nichols & Co. on October 18th guaranteed the signature of Blakslee. When the Empire Trust Company made its loan on October 18th, the certificate and stock power were in exactly the same form as when Talcott made his loan on November 8th. It was because the Trust Company had called its loan that the transaction with Talcott was had.

During the several years previous to this transaction in which Mr. Talcott had had dealings with Nichols & Co., loaning them sums of money from time to time, he had always received stock certificates as collateral security. At the time this loan was made, Nichols & Co. owed him between $30,000 and $40,000. On January 27, 1908, they owed him $30,935, including the loan of $7,500 made November 8, 1907, and on that day they gave Talcott a new note for the entire indebtedness; the Standard Oil stock in question continuing as collateral security for said note, and Talcott being unaware that Blakslee had any interest in the stock in question.

Nichols & Co. came into possession of this certificate and its accompanying assignment in the following manner: John V. Ritts, who was and had been for 20 years the vice president of the Butler County National Bank of Butler, Pa., had for some time been dealing in stocks with William E. Nichols & Co. On October 18, 1907, they had bought for his account 3,000 shares of Greene Cananea, a mining stock costing about $21,000, and 1,000 shares of Nippissing, costing about $9 or $10 a share.

Mr. Ritts testified that previously to the purchase of these stocks he had had cash settlements with Nichols & Co., who drew on him with the stocks attached to the drafts; but on this transaction he found it inconvenient to take up the stocks as he had done previously. Nichols & Co., having made this purchase for Ritts, were themselves having trouble in taking care of these stocks. It was during the panic of 1907. Ritts testified:

"They (Nichols & Co.) had telegraphed or telephoned me, I can't remember which, that they would have to have money to take up these stocks or collateral. That message came to me at Butler. We were having a run on our banks at Butler at the time. I was very busy. I was just preparing to go to Pittsburg, and I went to my box and got a number of stocks from the box, and I mailed from Pittsburg, if I remember rightly, this Standard Oil certificate of stock. * * * The power of attorney I put with the stock; that is my recollection. I put it in the envelope. * * * I registered that stock from Pittsburg, and I then went back to Butler. I found there a further message from New York saying in very strong terms that hell was to pay down in Wall street and I had better come on and take up my stocks. I came to New York that night. I reached the office of William E. Nichols & Co. the next morning about 10 o'clock, I think. I had other collateral, other certificates of stock with me in my possession. * * * I had a discussion as to the use of those other certificates of stock for the purpose of facilitating the raising of money. Some of them were acceptable to William E. Nichols & Co.; some of them were not acceptable. There were some of them that they knew nothing about. I took them all back with me when I returned home."

He also testified to a conversation with a member of the firm as to obtaining a loan on the Standard Oil stock which they already had in their possession.

"Q. Was anything said about the amount which was to be borrowed on that stock? A. There was to be borrowed enough money to take care of the stocks that were coming in and already had come in on my account."

As a result of this conversation, Nichols & Co. secured the loan of $7,500 first from the Empire Trust Company and then from Talcott, as above stated.

In the summer of 1909, Nichols & Co. being unable to pay their indebtedness, Talcott sought to have these 25 shares of stock transferred to himself in order to realize on the stock as collateral. The Standard Oil officers examined the transfer and asked that a letter be procured from William E. Nichols & Co. that the stock certificate and stock power came together when they were received by Nichols & Co. Such letter was procured, stating that they were pinned together when received, and on August 19, 1909, the certificate of stock, stock power, and letter were again presented to the officers of the Standard Oil Company, who thereupon exhibited a letter from defendant Blakslee in which he claimed to be the owner and notified the Standard Oil Company not to transfer the stock. In view of this letter, the company declined to transfer, whereupon this suit was brought.

To avoid the effect of the delivery of the certificate of stock, the assignment and power to Nichols & Co., and the transactions hereinbefore set forth, and to deprive the plaintiff of all right, title, and interest in and to the stock which had been delivered to him as collateral security for a loan of $7,500, the defendant Blakslee presented

this remarkable story: That he was the brother-in-law of Ritts, who had married his sister; that they have adjoining houses in Butler and have always been on the most friendly terms; that while Ritts was the vice president and the chief executive officer of the Butler County National Bank, Blakslee was the assistant cashier, and they were together daily during banking hours in the bank; that he had the highest respect for Mr. Ritts as a man of integrity and honor; that Mr. Ritts was a man of large means, considerably larger than Blakslee's.

Mr. Ritts testified, in regard to the delivery to him of the certificate of stock, as follows:

"Some time during August, I think it was, 1907, when the panic was on and stocks were tumbling, Mr. Blakslee, who was talking about buying an automobile, said, 'If I could make a little turn, I believe I would buy an automobile.' I says 'I am going to buy some Greene Cananea. I feel that if you buy a thousand shares of Greene Cananea that inside of a year's time you will have made money enough to buy an automobile.' 'Well,' he says, 'I am very glad to make some money but,' he says, 'I have done pretty well on—naming some other stock, then naming Standard Steel Car stock—and I have a notion to put that up and borrow some money out of the bank; I have not got enough money to pay for an automobile'—something to that effect. And I said: 'Well, what do you say, Will? Shall I buy you some?' And he says, 'Yes.' I says, 'I am going to buy some.' He says, 'All right.' I says, 'How much shall I buy for you?' He says, 'Buy a thousand shares for me.' And we spoke of the price, which was then about $7 or $8 at that time."

The Standard Oil certificate was delivered to Ritts two months before Greene Cananea was bought. Mr. Blakslee took it out of his private box and handed it to Mr. Ritts, who put it in his private box, to which Mr. Blakslee did not have access. Ritts testified:

"That was security for me in a measure. It was not security in the proper term of security. I said to him, 'Now you give me something to hold in this matter, and I will buy that stock at the right time.' * * * And he handed me this certificate of Standard Oil stock and asked me whether that would be sufficient, and I said that would be all right. * * * When I bought the stock, I intended that I should present to Blakslee 1,000 shares of it and expected him to settle. * * * 2,000 shares was mine and 1,000 shares was Mr. Blakslee's. It was intended for him. It was never delivered to him, but Mr. Blakslee did not know that that was his stock; he did not know that I had bought the stock. * * * The matter of buying the stock was not compulsory on my part; if I had bought the stock for myself, he would naturally have expected I would buy some for him. If I did not, he would have concluded that in my judgment it was not the thing for me to do and that I had concluded I would not buy it for him. That is the situation. * * * I intended transferring 1,000 shares to him and expected him to settle."

After delivering the certificate to Mr. Ritts, Mr. Blakslee testified he never inquired about the certificate and knew nothing about it for the period of two years, or until August, 1909, and although it was delivered to cover the purchase of 1,000 shares of Greene Cananea, out of the profits of which he expected to be able to purchase an automobile, he testified:

"I never asked him for the 1,000 shares of Greene Cananea; never asked him at all during this whole time."

In regard to the assignment and power, Blakslee testified that it was given by him to Ritts in the year 1904 to transfer some shares

of stock of the Butler County Bank; that Ritts, having received the stock power, put it in his private box and kept it there continuously until he sent it to Nichols & Co. Blakslee knew it was in Ritt's private safe, but said he forgot about the stock power being in Ritt's possession when he delivered to him the certificate of Standard Oil stock in 1907, and that in pledging said stock accompanied by this power of attorney Ritts "did something that he hadn't any right to"; that "he did not think Ritts committed a fraud on him"; that "he did not know whether Ritts did just right or not"; that "Ritts did not intentionally do wrong."

Ritts testified that, when he gave the transfer to William E. Nichols & Co., he did not mean it to be a trap for the bank, but that he meant it to be a genuine, sufficient stock power to get a loan. Mr. Ritts testified that he himself was a man held in the highest esteem in Butler by all his acquaintances, and that for a few thousand dollars he would not sacrifice that reputation and his sense of honor. When he sent the stock on to William E. Nichols & Co., he did not stop to think whether he was doing a thing he had a right to do.

"Q. And you have not any sense of wrongdoing in connection with that transaction whatever, have you? A. It was wrong; there is no question about that. It was a wrong thing, my having put up this stock as collateral. Q. But you have no sense of moral obliquity in reference to the matter; your conscience does not hurt you? A. Well, only that I realize if I had done a wrong thing I would have to go into the market and buy the stock and return it to him. * * * Q. Even assuming that you did improperly take this stock, you can make good to him to-day, can't you? A. I would expect to make good to Mr. Blakslee his stock if I did not return it. Q. If he has any claim against you? A. Well, he has a claim for 25 shares of Standard Oil stock. Q. You are abundantly able to make good to him? A. Well, I hope so."

To sum it up, the defense is that while Blakslee, the assistant cashier of the Butler County National Bank, delivered the certificate of Standard Oil stock to his brother-in-law, the vice president of the bank, as security to him for the purchase by him of 1,000 shares of Greene Cananea stock for Blakslee's account, it was not really security, but in case of Blakslee's death it would be in Ritts' possession with some sort of an undescribed lien attached to it, although without any of the indicia of ownership or power to transfer or deal with it; that the assignment and power, although duly executed by him, had been delivered to Ritts three years before for an entirely different purpose and had been kept by Ritts during all that time in his private safe; that when Ritts was suddenly called upon by his brokers he took that certificate of stock, pinned the transfer to it, and forwarded it to the brokers with the agreement with them that it should be used as collateral for a loan to be obtained by them; and that while both Blakslee and Ritts agree that Ritts is a man of the highest integrity and honor, yet, as matter of fact, he was guilty of the conversion of Blakslee's stock; and hence that no title was conveyed to Talcott, and he must lose the amount of money loaned by him upon the strength of these documents.

[1, 2] If the assignment and power had been indorsed upon the back of the certificate, although in blank except as to signature and

witness, I apprehend there would be no doubt, although a certificate of stock is not a negotiable instrument, that it would have presented such indicia of title that an innocent holder would have obtained good title. McNeil v. Tenth National Bank, 46 N. Y. 325, 7 Am. Rep. 341. And if the assignment and power, though upon a separate paper, had identified by description the property intended to be assigned, the same rule would have applied. Smith v. Savin, 141 N. Y. 315, 36 N. E. 338. But, it is claimed, although duly executed, the signature properly guaranteed, pinned to the certificate of stock, and delivered and received in the regular course of business, that being upon a separate paper and blank as to the property intended to be assigned to it conferred no title upon Talcott, but on the contrary put him upon his inquiry and destroyed his claim of being an innocent holder for value.

[3] I cannot accept at its face value the testimony of Blakslee and Ritts, deeply interested in the event as they are, Blakslee, an inferior officer of the bank, and Ritts the vice president and chief executive thereof, and a man of substance and power; the attempt being to relieve Ritts of a clear obligation to Blakslee, even at the expense of blackening himself. From such men, accustomed for years to banking and stock transactions, such a story is not credible. But even assuming it to be true, I think the plaintiff entitled to the remedy prayed. There was nothing which could reasonably be held to put him on his guard. The transaction occurred in the regular course of business; the amount advanced by him and the terms of the loan were reasonable and precisely the same terms that had been given by the Trust Company. Certainly the conduct of the defendant and of his brother-in-law made possible the transaction. So far as Nichols & Co. were concerned, the documents having been received either by mail or personally from Ritts, and the discussion and interviews in regard thereto having been had with him, they were absolutely entitled to rely upon the bona fides of the transaction. If they were, it seems to me that everybody dealing with them upon the same papers in carrying out the precise transaction for which they were procured by Nichols & Co. must be entitled to the benefit of that knowledge which, in addition to the apparent regularity of the transaction, conferred authority to act under the power.

In the cases which have dealt with the fundamental question here involved, the reasons given for the decision of the court seem to me applicable to the situation here presented. Thus in McNeil v. Tenth National Bank, 46 N. Y. 325, 7 Am. Rep. 341, Judge Rapallo said:

"Where the true owner holds out another, or allows him to appear, as the owner of, or as having full power of disposition over, the property, and innocent third parties are thus led into dealing with such apparent owner, they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance."

So in this case, Blakslee did deliver the certificate of stock to Ritts for security when about to engage in a joint stock purchasing enter-

prise; Blakslee did execute and deliver to Ritts a blank assignment and power of attorney and with the intent that it should be an effective power and should be used by Ritts under certain circumstances. When, therefore, Ritts, in performance of the purchase agreed upon between him and Blakslee, presented to Nichols & Co. this certificate and this power with the request that they should use it as security to obtain a loan to carry the stocks which they had bought for his account, and Talcott thereon advanced his money, Talcott's rights are derived from the act of the real owner, Blakslee, "which precludes him from disputing, as against" Talcott, "the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in" Ritts. Blakslee, and Blakslee alone, created the opportunity, of which Ritts availed himself, to clothe himself with the apparent ownership of the stock.

As further said in the McNeil Case:

"The true point of inquiry in this case is whether the plaintiff did confer upon his brokers such an apparent title to or power of disposition over the shares in question, as will thus estop him from asserting his own title, as against parties who took bona fide through the brokers."

Again:

"The common practice of passing the title to stock by delivery of the certificate with blank assignment and power has been repeatedly shown and sanctioned in cases which have come before our courts. * * * The holder of such a certificate and power possesses all the external indicia of title to the stock, and an apparently unlimited power of disposition over it. * * * Such, then, being the nature and effect of the documents with which the plaintiff intrusted his brokers, what position does he occupy toward persons who, in reliance upon those documents, have in good faith advanced money to the brokers or their assigns on a pledge of the shares? When he asserts his title, and claims, as against them, that he could not be deprived of his property without his consent, cannot he be truly answered that, by leaving the certificate in the hands of his brokers, accompanied by an instrument bearing his own signature, which purported to be executed for a consideration, and to convey the title away from him, and to empower the bearer of it irrevocably to dispose of the stock, he in fact 'substituted his trust in the honesty of his brokers, for the control which the law gave him over his own property,' and that the consequences of a betrayal of that trust should fall upon him who reposed it, rather than upon innocent strangers from whom the brokers were thereby enabled to obtain their money?"

In Moore v. Metropolitan Bank, 55 N. Y. 46, 14 Am. Rep. 173, Grover, J., said:

"One reason why an owner of corporate shares or of goods or chattels, who has conferred upon another the apparent ownership, without transferring to him a valid title, was held precluded from asserting his title, against a bona fide purchaser from such apparent owner, is that such purchase was made upon the faith of the title which he had apparently given, and that it would be contrary to justice and good conscience to permit him to assert his real title against an innocent purchaser from one clothed by him with all the indicia of ownership and power of disposition. * * * Another reason is that it presents a proper case for the application of the legal maxim that, where one of two innocent parties must sustain a loss from the fraud of a third, such loss shall fall upon the one, if either, whose act enabled such fraud to be committed."

It seems to me that nothing could be more contrary to justice and good conscience than to permit these brothers-in-law, fellow bank offi-

cers and participators in a stock purchase, to throw upon the banker the loss of the money loaned and required.in that stock transaction, by a denial of agency, and the assertion of fraud and conversion as between themselves.

[4] I think the claim that both the certificate and the power were delivered to Ritts for a limited purpose is met by the language of the court in Knox v. Eden Musee Co., 148 N. Y. 441, 42 N. E. 988, 31 L. R. A. 779, 51 Am. St. Rep. 700, where Andrews, C. J., said of the McNeil Case, supra:

"That case holds that an agent to whom the owner has delivered a certificate of stock duly indorsed for transfer, with a limited power of disposition for a special purpose, may bind the title thereto as against the true owner by transferring it to a bona fide transferee who has no notice of the limitations of the agent's authority, although the transfer was made for an unauthorized purpose and with the intention on the part of the agent to commit a fraud upon his principal."

This may be considered a border line case, and yet I cannot escape the conviction that the reasoning of the adjudicated cases applies, and that the owner of the stock should be relegated for his remedy to the unfaithful agent whom he trusted, who asserts that he is amply able to respond and upon whom there has been no demand. The plaintiff should not suffer loss. He innocently parted with his money under circumstances and upon apparent evidence of title presented by the fraud of Ritts and made possible, accepting the defendant's story, by his own negligence and misplaced confidence.

The judgment appealed from should be reversed, and a new trial ordered, with costs and disbursements to the appellant to abide the event.

INGRAHAM, P. J., and McLAUGHLIN, J., concur.

LAUGHLIN, J. I vote for affirmance on the opinion of Mr. Justice O'Gorman at Special Term.

MILLER, J. (dissenting). The mere delivery of the certificate of stock by Blakslee to Ritts did not confer even apparent authority upon the latter to transfer it to a third party. The undisputed testimony of Blakslee and Ritts supports the finding of the trial court to the effect that the power of attorney in blank, signed by Blakslee, had been given to Ritts years before the delivery of the certificate in question for the specific purpose of enabling Ritts to transfer certain stock of the Butler County National Bank standing in the name of Blakslee, that no occasion to use it arose, and that its existence had been forgotten. It seems to me that the case is precisely the same as though Ritts had abstracted the blank power of attorney from papers in Blakslee's possession, though it may be that, if it had been filled up with a description of the certificate in question, the plaintiff would have been entitled to rely upon it. Upon the back of the certificate was an unsigned blank assignment and power of attorney, which was enough of itself to suggest to the plaintiff the possibility that the blank power of attorney pinned to the certificate had been given for a different

purpose. The two papers, though pinned together, were entirely different instruments. The power of attorney did not purport in any way to relate to the 25 shares, and I do not think that the mere fact that it was pinned to the certificate justified the plaintiff in blindly relying upon it. While it is of little consequence, except as bearing upon the conduct of Ritts, it appears that, in order to obtain the certificate, he offered to pay the sum that the plaintiff originally loaned on it. I think the plaintiff's representative made a mistake in not accepting that offer, and vote to affirm the judgment.