"In referring to the principles relating to trade-marks, and upon which their efficiency as such depends, it may be observed that there is no exclusive right to represent by them an idea, nor can there be an exclusive appropriation of that which is descriptive of the articles to which they are attached, or that which indicates their ingredients, mode of composition, characteristic properties, quality, or nature"—citing Enoch Morgan's Sons Co. v. Troxell, 89 N. Y. 292, 42 Am. Rep. 294; Amoskeag Mfg. Co. v. Spear, 2 Sandf. 599; Caswell v. Davis, 58 N. Y. 223, 17 Am. Rep. 233.

[7] We are of the opinion that these principles applied to the case in hand lead to the result that neither party has any exclusive right to the use of the word "Security" as a trade-mark. It appears that the defendant has secured the registration of the word by the United States Patent Office as a trade-mark for its own use, and is naturally anxious to retain the benefit conferred by such registration. Its registration, however, is not conclusive upon the courts as to its validity or right to the registry. It appears that the plaintiff applied to the government for the registration of the word as a trade-mark, and its application was rejected upon substantially the same grounds and for the same reasons above stated by us. Upon an application by the defendant, however, the department appears to have reversed its ruling made on the application of the plaintiff. We think its first action was correct, and in conformity with the rules of law which govern the subject. We therefore hold that the plaintiff has no exclusive right to the use of the word "Security" applied to the particular design of tire in question.

There is no question of unfair competition involved in this case. The evidence is that this word, when used by the defendant on the tires manufactured by it, is used in connection with the further words, "Made by the Batavia Rubber Company," so that the public is advised of the origin of the particular article offered for sale. We therefore are of the opinion the plaintiff is not entitled to the injunction asked.

As a conclusion of the whole matter, we hold the plaintiff's complaint should be dismissed, and that the defendant is entitled to judgment on its counterclaim to recover back the sum of $758.74, paid by it for royalties under the contract.

So ordered.

---

(89 Misc. Rep. 587)

### FISHER v. MECHANICS' & METALS NAT. BANK et al.

(Supreme Court, Special Term, New York County. March, 1915.)

1. BROKERS ⟨⟩34—STOCKBROKERS—FRAUDULENT REPRESENTATIONS—STOCK ON HAND.

That stockbrokers, at the time of representing that they were holding and carrying for a purchaser of stock on margin the amount of stock bought by him, and by such representations securing from him a pledge of certain securities, did not have on hand out of loan sufficient stock to enable them to deliver on demand all shares purchased by all customers, did not render such representations fraudulent as to such purchaser, where they were carrying out of loan at least the difference between their purchases for the account of customers and their loans.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 26; Dec. Dig. ⟨⟩34.]

**2. BROKERS ☞24—STOCKBROKERS—AGREEMENT "TO HOLD OR CARRY STOCKS."**

An agreement by stockbrokers "to hold or carry stocks" does not bind them to keep the identical stock, or to keep the specified number of shares, in their safety deposit vault free and ready for delivery on demand, but merely binds them to be ready and able to deliver the shares under the rules of the Stock Exchange on payment therefor.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 19; Dec. Dig. ☞24.]

**3. CORPORATIONS ☞123—CERTIFICATE OF STOCK—BLANK TRANSFER—RIGHTS OF TRANSFEREE.**

The blank transfer of a certificate of stock, with an irrevocable power of attorney to transfer, signed by the person who appears from the certificate to be the owner, confers on the holder of the certificate apparent title to the stock, and entitles a bona fide transferee of same from the holder to hold it against the real owner.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 481, 491, 507–512, 537, 539–546, 569, 618; Dec. Dig. ☞123.]

**4. ESTOPPEL ☞72—TWO INNOCENT PERSONS—ACT OF THIRD PERSON.**

Where one of two innocent persons must sustain a loss from the wrong of a third, such loss must, except where the instrument claimed to create the estoppel was obtained by common-law larceny, fall on the one, if either, whose act has enabled such fraud to be committed.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 188; Dec. Dig. ☞72.]

**5. ESTOPPEL ☞53—UNINTENTIONAL ACT.**

There can be no estoppel by virtue of an act done unintentionally against one's will.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 126, 127; Dec. Dig. ☞53.]

**6. CORPORATIONS ☞123—CERTIFICATE OF STOCK—PLEDGE—BONA FIDE HOLDER—NOTICE.**

That a certificate of stock pledged with brokers as a margin on a speculative account stood in the name of the pledgor, and not in the name of the broker, was not sufficient to put a transferee thereof on inquiry, or to show that it was not a bona fide holder of the stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 481, 491, 507–512, 537, 539–546, 569, 618; Dec. Dig. ☞123.]

Action by William P. Fisher against the Mechanics' & Metals National Bank and others. Judgment according to opinion.

Richard T. Greene, of New York City, for plaintiff.

Frank M. Patterson, of New York City, for defendant Mechanics' & Metals Nat. Bank.

Olcott, Gruber, Bonynge & McManus, of New York City, for defendants Stoppani & Hotchkin.

SHEARN, J.   Plaintiff, a customer of a stockbroker's firm, with whom he had pledged as his margin on a speculative account certain certificates of stock indorsed in blank and unregistered bonds, sues the defendant bank, with whom the brokers had in turn pledged the securities as collateral to a bank loan, for the return of the securities on the ground that the brokers, who had subsequently become bankrupt, had broken the original pledge by fraudulent representations. The brokers and the bank's assignee of certain of the securities

and the general assignee of the bankrupt firm are joined as defendants.

The representations alleged consist in the main of written monthly statements of account rendered by the brokers to the plaintiff during the period of three years. These statements are in the usual debit and credit form, showing purchases and sales made under and pursuant to the rules, regulations, and customs of the New York Consolidated Stock Exchange and showing the state of the account between the brokers and the customer. Plaintiff claims that these statements, reasonably construed, represent that the brokers had purchased and were holding according to the manner of legitimate brokers and members of the Exchange the shares of stock represented on the statements as bought for the account of the plaintiff, and further represented that the plaintiff was actually indebted to the brokers for the purchase price of all the stock, as set forth in the monthly statements. In part, plaintiff alleges that from April 29, 1910, to May 18, 1914, these statements represented that the brokers were holding for plaintiff's account at least 400 shares of the common stock of the American Smelting & Refining Company, referred to generally as "smelters." These representations are alleged to have been false, known to be false by the brokers, made for the purpose of inducing plaintiff to make further deposits of marginal security, and relied on by the plaintiff in delivering the collateral in suit. Assuming, but not holding, that brokers purchasing for a customer on a 10 per cent. margin are obliged to hold and carry the stocks, ready for delivery on demand, and that the statements of account so represent, let us examine the proof.

The first pledge of the collateral involved was made on April 28, 1910, and consisted of 100 shares of the capital stock of the North American Company, indorsed in blank by plaintiff, January 17, 1908. At the time of the pledge, according to the brokers' accounts rendered, the plaintiff was "long" of 300 shares of "smelters" purchased by the brokers for plaintiff's account. In order to establish that the brokers were not holding or carrying these shares, and could not deliver them if demanded, plaintiff proved the state of the brokers' accounts in "smelters" with all of their customers, and their loans of "smelters" to other brokers, and the shares in the brokers' safe deposit vault and bank as of the date of the pledge. There were not taken into consideration transactions on the New York Stock Exchange, of which the brokers were not members, of the personal speculative accounts of the brokers themselves, or their borrowings of stock. For the purpose of this decision it will be assumed that these elements were properly excluded. The result disclosed that on the day of the pledge the brokers had bought for customers 1,610 more shares of "smelters" than they had sold, and had 800 shares outstanding on loans. It is conceded that the 800 shares on loans were shares held or carried under the rules of the Exchange, and exceeded the number of shares that plaintiff could demand on paying his debt to the firm. But plaintiff claims that it should not be considered that the brokers were holding and carrying his shares, because, he argues, if

all of the brokers' customers had demanded possession of all of their purchased shares, the brokers, on this state of the account, would have been unable to deliver all of the shares, and the plaintiff might have been deprived of his.

[1, 2] In other words, the representation was not as alleged, that the brokers were carrying the number of shares purchased for plaintiff, but that they were so so conducting their business as to be unable to deliver on demand all shares purchased for all customers. How far-fetched a proposition this is appears from this mere statement. Certainly it is unsubstantial as evidence of an actual fraud practiced upon the plaintiff. Moreover, there is no justification in the proof for assuming that the number of shares out of loan represented the stock available for delivery under the rules and customs of the Exchange. The more correct figure, representing stock available for delivery, would seem to be the difference between the number of shares owing to customers and the number of shares loaned, which would, in this case, be 810 shares. When the clearing sheets went through (they went through twice a week) the shares loaned would be wiped out by the shares bought, and leave the difference to be taken up by the brokers, either with the money tendered in payment by the customer who demanded his shares, or by a cash payment by the brokers from their funds in the bank, or by borrowing and then hypothecating an equivalent number of shares of other stocks from other brokers. To hold or carry stocks does not mean to keep the identical stocks or to keep the specified number of shares in the brokers' safe deposit vault free and ready for delivery on demand. It means readiness and ability to deliver the shares under the rules of the Exchange upon payment therefor.

On April 28, 1910, brokers were holding and carrying in "smelters" at least the difference between their purchases for the account of customers and their loans, namely, 810 shares, which was in excess of the number alleged to have been represented to have been purchased and carried. There was no false representation here. When the bonds were pledged April 20, 1911, the plaintiff was "long" 500 shares of "smelters," according to the account rendered. On that day the difference between the number of shares purchased for customers, 1,150, and the number of shares loaned, 520, or 630 shares, an excess over the number plaintiff was entitled to on payment of his account. On December 6, 1912, when United States Rubber stock was pledged, plaintiff was "long" 800 shares of "smelters," according to the account rendered, and the difference between the number of shares purchased for account of customers, 1,185, and the number of shares loaned, 260, was 925 shares, an excess over the number of shares plaintiff was entitled to on payment of his account. In addition, there were 5 shares in the brokers' safe. On June 10, 1913, when the 100 shares of "smelters" were pledged, plaintiff was "long" 800 shares of "smelters," according to the account rendered, and the difference between the number of shares purchased for the account of customers, 1,000, and the number of shares loaned, 140, was 860 shares. Therefore, on the occasion of each pledge, the proof shows, even excluding the un-

disclosed transactions on the New York Stock Exchange, brokers' personal purchases and sales, and brokers' belongings of stock, the brokers were holding and carrying under the rules of the Exchange a greater number of shares than plaintiff was entitled to demand on payment of his account, and the alleged representations were not proved to be false. There was a valid debt and a valid pledge.

[3] But, even had the plaintiff succeeded in establishing that the delivery of the bonds and the indorsed certificates of stock in pledge were procured by false representations, he could not recover the securities from the bank with which they had been pledged by the brokers as security for a loan. The securities were quasi negotiable, and the bank was a bona fide holder, having taken the securities in due course with other collateral for a loan of $49,000. A blank transfer of a certificate of stock, with an irrevocable power of attorney to transfer, signed by the person who appears by the certificate to be the owner, confers upon the holder of the certificate apparent title to the stock, and the bona fide transferee of such stock from the holder can hold the stock against the real owner, who is estopped from asserting his title. McNeil v. Tenth National Bank, 46 N. Y. 325, 7 Am. Rep. 341; Talcott v. Standard Oil Co., 149 App. Div. 694, 134 N. Y. Supp. 617; Mitchell v. Boyer, 160 App. Div. 565, 145 N. Y. Supp. 715. The reason for this well-settled rule is that, where one has conferred upon another apparent ownership, it is contrary to justice and good conscience to permit him to assert his real title against an innocent purchaser from one clothed by him with all the indicia of ownership and power of disposition.

[4, 5] Another reason for the rule is that such a case calls for the application of the legal maxim that, where one of two innocent parties must sustain a loss from the fraud of a third, such loss shall fall upon the one, if either, whose act has enabled such fraud to be committed. Moore v. Metropolitan National Bank, 55 N. Y. 46, 14 Am. Rep. 173. It is true that there is an exception to this rule where the instrument claimed to create the estoppel is obtained by common-law larceny. It is argued on behalf of plaintiff that, because obtaining property by false representations is larceny under the statute, the same rule, so far as estoppel is concerned, should apply, no matter what the character of the larceny. This argument ignores the reason for the exception in the case of common-law laceny, which involves the taking against the will of the owner. Obviously there can be no estoppel by virtue of an act that is done unintentionally against one's will. The radical distinction between common-law larceny and larceny by false pretenses is well settled. People v. Dumar, 106 N. Y. 502, 13 N. E. 325; People v. Miller, 169 N. Y. 339, 62 N. E. 418, 88 Am. St. Rep. 546. As was said in Green v. Grigg, 98 App. Div. 445, 449, 90 N. Y. Supp. 769, 772:

"The claim of the plaintiff rests upon the principle that the property was obtained by larceny, and therefore no title passed to the purchaser; but we think a plain distinction exists between a larceny by which the property is taken without the knowledge or consent or against the will of the owner and one by false representations."

[6] But plaintiff claims that the bank was put on notice, and therefore is not a bona fide holder; this by virtue of the fact that the certificates of stock stood in the name of the plaintiff, and not in the name of the brokers. This point is without merit. It is common knowledge that certificates of stock standing in the name of an original owner and indorsed in blank are dealt in thousands of times, and during a period often of many years, without change of name of the original owner, although title has changed on innumerable occasions. But even if the bank had been put on inquiry, and had sent for the plaintiff and questioned him concerning the brokers' right to pledge the stock, it would have learned nothing that would even have warranted a suspicion. The plaintiff would have been obliged to inform the bank, speaking truthfully, that he had pledged the securities with the brokers, and that the brokers were authorized to rehypothecate the same, and, further, that he had even signed a consent that the securities might be pledged for a greater amount than his indebtedness to the brokers. Inquiry of the brokers would have been fruitless. Even assuming that the plaintiff was right in his contention that the brokers were unable on the day of the pledge to deliver all purchased stock to customers on demand, and that this was evidence of a fraud practiced by the brokers upon their customers, the facts could only be ascertained by the bank after putting experts upon the brokers' books. It has taken nearly a week to develop the state of the accounts upon this trial, and even now their significance is in dispute. It is unreasonable to impose any such obligations on banks in making loans on quasi negotiable instruments. Business could not be transacted on any such basis and the law imposes no such unreasonable burden.

Judgment for the defendant Mechanics' & Metals National Bank, and its assignee, Rohlfs, with costs. The account between the plaintiff and Stoppani & Hotchkin is stated, with interest from May 18, 1914, at $20,460.65, for which sum judgment is awarded the plaintiff, less the amount which may remain in the hands of the bank or its assignee after satisfying the balance of its claim, amounting to $6,435.-92, out of the collateral undisposed of, which said amount the bank is authorized and directed to pay over to the plaintiff.

Judgment accordingly.