24175. FULTON NATIONAL BANK OF ATLANTA *v.* MOODY.

DECIDED APRIL 26, 1935.

*Harold Hirsch, Marion Smith, A. S. Clay,* for plaintiff in error. *Spalding, MacDougald & Sibley,* contra.

GUERRY, J. Moody brought his action against the Fulton National Bank to recover 53 shares of stock in the Coca-Cola International Corporation, represented by one certificate issued to him in his name. The bank admitted possession of the stock, which had been issued to Moody, and that Moody had a good title thereto

except for the fact that the stock had been pledged to it as security for a loan. The case was tried on an agreed statement of facts and certain undisputed testimony. It was agreed that: The stock certificate sued for stood in the name of Moody and is owned by him, unless his title is affected by facts herein detailed. Moody has not lived in Atlanta since 1926, but has kept this particular stock, together with other stocks and securities, in an envelope sealed and marked with his name and placed in the safety deposit box of his mother, Mrs. Moody, which box was kept by the Trust Company of Georgia, and was of the kind in general use and handled by said Trust Company in the customary manner. It could only be opened by the key kept and owned by Mrs. Moody. Mr. Wesley Shropshire prior to his death was Assistant Secretary and Treasurer of the Trust Company of Georgia, and enjoyed an excellent reputation for sterling honesty and character. The only access Shropshire had to said certificate of stock in litigation was that when Mrs. Moody desired to go into her safety deposit box she would give her key to Shropshire and tell him to go down stairs where the box was kept and get it and bring it to her, she being slightly crippled and not desiring to walk up and down the stairs. The box itself when taken out of its locked receptacle was open. When Mrs. Moody would take out or put in any papers she desired, she would return the box to Shropshire for him to lock up for her. Moody owned two small blocks of stock in the Atlanta & Lowry National Bank, and this bank was merged with the Fourth National Bank in the fall of 1929 under the name of the First National Bank of Atlanta. The stockholders of the two first-named banks surrendered their stock for cancellation and received in lieu thereof stock in the First National Bank of Atlanta. The Trust Company of Georgia was transfer agent at the time for Atlanta and Lowry National Bank and the First National Bank of Atlanta, and, as such agent, it requested all stockholders of the Atlanta and Lowry National Bank to send in their old certificates and secure new certificates in the First National Bank, the entire process being under the supervision and control of the Trust Company of Georgia. Some of these certificates were slow in coming in, and in individual cases had to be followed up later on. The consolidation was on November 25, 1929. Wesley Shropshire was authorized, directed, and requested by the Trust Company of Geor-

gia to secure such certificate from Moody, who was living at that time in Massachusetts, because he was in touch with Mrs. Moody and Mr. Moody by correspondence. "Charles Glenn Moody received notice from the bank of the fact of the merger, and the terms thereof, and was requested to deliver up his stock in the Atlanta & Lowry National Bank for cancellation and exchange for stock in the First National Bank of Atlanta. At that time he was teaching school in Massachusetts. He also received from Mr. Wesley Shropshire two blank powers of attorney, which he was requested to execute, and did execute, to facilitate the exchange and transfer of the stock of the Atlanta & Lowry National Bank for the new stock of the First National Bank of Atlanta. . . Said powers of attorney were signed and the blanks not filled in and mailed to Wesley Shropshire." The power of attorney which was attached to the Coca-Cola stock when it was pledged by Shropshire to the Fulton National Bank is one of the powers above set out.

In June, 1931, Wesley Shropshire secured a loan of $10,000 from the Fulton National Bank and pledged to it, as security therefor, certain other stock and the Coca-Cola stock sued for in this case, to which stock was attached the blank power of attorney sent him by Moody. The power of attorney came into the possession of Wesley Shropshire by reason of the fact that it was sent him by Moody for the purpose of being used in the cancellation of the bank stock above referred to and the issuance of new stock. Mrs. Moody was authorized to act for her son in any manner affecting the exchange of the stock-certificates placed in her safety-deposit box. When she desired to enter such box she would go to the Trust Company of Georgia and turn over the key of the deposit box to Shropshire, who would unlock the vault and take therefrom the metal box containing her securities and also containing the sealed envelope in which Charles Glenn Moody's securities were placed. Shropshire would bring the metal box to Mrs. Moody from the basement to the main floor, and when Mrs. Moody had finished with the box he would take it back to the basement floor and return the key to her. This was done on many occasions. Mrs. Moody testified: that she remembered when the First National Bank was formed and the stock of the Atlanta & Lowry Bank and the Trust Company of Georgia was exchanged for stock of the First National Bank; that she delivered the sealed

envelope in question to Wesley Shropshire so that he might secure the Atlanta & Lowry stock for some purpose; that the envelope was sealed when she delivered it to Wesley Shropshire, and was sealed when he returned it to her, and she does not know what, if any, stock was taken from the envelope. The sealed envelope was opened only by Shropshire. It contained the bank stock and the Coca-Cola stock as well as other securities. It was opened by Shropshire at the direction of Mrs. Moody, for the purpose of getting out the Atlanta & Lowry Bank stock, and was opened and the bank stock gotten out and the envelope resealed by Shropshire. There is no evidence that the envelope was opened at any other time. Shropshire died on May 9, 1932, under circumstances which indicated he had committed suicide. Moody did not learn until after Shropshire's death that his Coca-Cola stock was not in the sealed envelope or that it had been pledged by Shropshire to the Fulton National Bank, nor did Moody or his mother have any information up to that time that would in any way reflect upon the character or conduct of Shropshire. No permission had ever been asked by or granted to Shropshire with reference to the pledging of said Coca-Cola stock or the using of said power of attorney other than in the transfer of the bank stock above referred to. A verdict was directed by the court in favor of Moody, and the Fulton National Bank excepted.

Mr. Justice Day in the case of National Safe Deposit Co. *v.* Hibbs, 229 U. S. 391, 395 (33 Sup. Ct. 818, 57 L. ed. 1241), used the following language, which exactly expresses the contentions of the parties in the present case. "In this case conflicting legal principles are invoked and relied upon. For the defendant in error [plaintiff in error here] the familiar principle that 'where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss, must sustain it' is advanced. The plaintiff in error [defendant in error here] invokes the principle that where the owner of property, such as stock certificates, has lost it by the criminal or fraudulent act of another, the owner not voluntarily or negligently conferring upon such other the indicia of ownership or apparent title can not be deprived of his property by the attempted transfer of title to a third person for value, no matter how innocent the purchaser may be of knowledge of the crime or fraud by which the property was

acquired." Were this stock certificate sued for a negotiable instrument, under the negotiable instruments law (Michie's Code, § 4294(52)), there could be no question but that the title of the Fulton National Bank would prevail. If the stock certificate in this case is treated strictly as a chattel or goods, section 4118 of the Code will apply: "The seller can convey no greater title than he has himself," and Moody would be entitled to recover. In Knox v. Eden Musee Americain Co., 148 N. Y. 441 (42 N. E. 988, 31 L. R. A. 779, 51 Am. St. R. 700), it was said: "The courts have frequently been importuned to extend the qualities of negotiability of stock certificates beyond the limits mentioned and clothe them with the same character of complete negotiability as attaches to commercial paper, so as to make a transfer to a purchaser in good faith, for value, equivalent to actual title, although there was no agency in the transferor and the certificate had been lost without the fault of the true owner or had been obtained by theft or robbery. But the courts have refused to accede to this view, and we have found no case entitled to be regarded as authority which denies to the owner of a stock certificate, which has been lost without his negligence, or stolen, the right to reclaim it from the hands of any person in whose possession it subsequently comes, although the holder may have taken it in good faith and for value." Quoting further from the same case: "It may perhaps be doubted, taking into consideration the interest of investors as well as dealers, whether it would be wise to remove the protection which the true owner of a stock certificate now has against accident, theft, or robbery." See, in this connection, Shaw v. North Penn. R. Co., 101 U. S. 557 (25 L. ed. 892). On the other hand, certificates of stock are universally recognized as possessing certain attributes in common with commercial paper, which led to their designation as "quasi-negotiable instruments." See, in this connection, 12 Fletcher's Enc. Cor. § 5477. "Stock certificates are a peculiar kind of property. Although not negotiable paper, strictly speaking, they are the basis of commercial transactions large and small, and are frequently sold in open market as negotiable securities are. . . Although neither in form or character negotiable paper, they approximate to it as nearly as practicable. . . Whoever in good faith buys the stock, and produces to the corporation the certificates, regularly assigned, with power to transfer, is entitled to

have the stock transferred to him." First Nat. Bk. *v.* Lanier, 11 Wall. 369 (20 L. ed. 172); National Safe Deposit Co. *v.* Hibbs, supra. In the case of Baker *v.* Davie, 211 Mass. 429 (97 N. E. 1094), it was said, in effect, that the true owner of corporate stock who has *knowingly* placed in another's hands his stock certificates accompanied by a separate instrument of powers of attorney and transfer signed in blank, can not assert his title as against a pledgee in good faith, no matter how faithless the pledgor was to the agreement with owner by which he obtained possession. See, in this connection, Talcott *v.* Standard Oil Co., 149 App. Div. 694 (134 N. Y. Supp. 617); Smith *v.* Savin, 141 N. Y. 315 (36 N. E. 338); Crawford *v.* Dollar Saving Fund & Trust Co., 236 Pa. 206 (84 Atl. 694). In 12 Fletcher's Enc. Cor. § 5562, it is said: "The true owner of stock may be estopped to assert his title thereto against a bona fide purchaser or pledgee from one whom such owner has intentionally or through negligence clothed with indicia of ownership." The Code of 1933, § 96-207, says: "Where an owner has given to another such evidence of the right of selling his goods as, according to the custom of the trade or the common understanding of the world, usually accompanies the authority of disposal, or has given the external indicia of the right of disposing of his property, a sale to an innocent purchaser divests the true owner's title."

In the case at bar it is not questioned that the Fulton National Bank was a bona fide purchaser or pledgee of the stock certificate sued for, and that it was without notice of any limitation on the right of Shropshire to sell or dispose of the stock certificate. He had possession of the certificate and was clothed with an indicia of authority to transfer the same. If this possession of the stock was obtained by theft on the part of Shropshire without the element of trust reposed entering therein, no title would be passed to a purchaser from Shropshire, however innocent. Moody entrusted the blank power of attorney to Shropshire, and did so charged with notice of the power to deceive that he was putting into another's hands. As was said in the case of Scollans *v.* Rollins, 179 Mass. 346 (60 N. E. 983, 88 Am. St. R. 386): "If the owner of the instrument intrusts it to another, he does so charged with notice of the power to deceive which he is putting in another's hands, and if deception follows he must bear the burden." See authorities there

cited. Quoting further from the same case: "In this case, as in some others, it can not be said that the owner is free from all obligation to contemplate the possibility of wrong doing by a third person." In the case of Russell v. American Bell Telephone Co., 180 Mass. 467 (62 N. E. 751) it was said: "Where there is a custom among banks and brokers for certificates of stock with the transfer on the back signed in blank to pass from hand to hand without inquiry, one who intrusts to a broker such a certificate thus signed for the purpose of having it exchanged for a new certificate including an additional share is estopped to assert his title against a *bona fide* pledgee to whom the broker fraudulently has pledged the certificate to secure his own debt, and whether or not the broker's act amounted to larceny is immaterial." "The qualification of the rule, as not applying when the instrument is stolen, is not based upon the name of the agent's crime but upon the fact that in the ordinary and typical case of theft the owner has not intrusted the agent with the document and therefore is not considered to have done enough to be estopped as against a purchaser in good faith. He certainly has not done enough if the estoppel is based upon the principle that when one of two innocent persons is to suffer, the sufferer should be the one whose confidence put into the hands of the wrongdoer the means of doing the wrong." Russell v. Am. Bell Tel. Co., supra.

Did the possession of the Coca-Cola stock certificate itself come as a result of a simple larceny or was it a larceny after trust? Mrs. Moody, as agent for her son, intrusted to Shropshire the possession of the sealed envelope and also its contents, for it is disclosed that she authorized Shropshire to break the seal of the envelope and take from its contents the stock of the Lowry Bank. By this action Shropshire was trusted with access to the contents of this envelope. But this circumstance by itself was not an intrusting of the certificate of Coca-Cola stock to Shropshire. As was said in Knox v. Eden Musee, supra: "The certificates were at all times after their surrender and before they were abstracted by Jurgens from the safe of the defendant in legal possession of the company. The company never placed them in the possession of Jurgens or invested him with the indicia of ownership. He had access to the safe as a mere servant of the defendant." "It is not true as a general rule that a man may not intrust his property to

the custody of a servant except at the peril of losing his title thereto if the servant steals and disposes of it to another. There must be something more than mere intrusting to a servant the custody of a chattel and the consequent opportunity for theft in order to preclude the master from reclaiming it if stolen by the servant and sold to another." Knox *v*. Eden Musee, supra. "Breaches of trust and confidence unfortunately are not infrequent. But honesty is, nevertheless, we believe, the general rule of human conduct, and one may indulge in this faith in human nature, and trust those who have proved themselves worthy of it, without subjecting himself to a charge of negligence if it should turn out that they afterwards yielded to temptation and used their position to the injury of others." Knox *v*. Eden Musee, supra. Applying the above principle it can not be said that the giving of access to the certificate to Shropshire by Moody in the manner and in the capacity in which it was done was such an intrusting of it to Moody as would alone estop him from claiming title thereto as against an innocent pledgee.

We can not fail to notice and admire the fairness, frankness, and candor of counsel for both sides in presenting this case. As was said in the brief of attorney for plaintiff in error: "The exact differences between counsel are of relatively narrow range. They relate to a disagreement over the first of the ultimate facts on which we predicate our defense. That ultimate fact was that Moody voluntarily placed in Shropshire's hands (1) the power of attorney executed in blank, and (2) the stock certificate. Opposing counsel deny both parts of this statement. Their legal position in effect concedes that if this statement is true Moody was not entitled to recover." We are prepared to agree that this is a correct statement and we think the law as we have attempted to set out above is assented to by counsel for both sides. For the defendant in the court below to prevail it must establish its affirmative defense,—that is, that Moody intrusted both the power of attorney signed in blank to Shropshire and also the Coca-Cola stock certificate. Unless both of these alleged facts are established by evidence, the defendant was not entitled to prevail. With the first statement, that is, that the blank power of attorney was voluntarily intrusted to Shropshire, we are inclined to agree. Moody was charged with notice of the power to deceive he was placing in Shrop-

shire's hands, and if deception followed he must bear the burden. It was the clothing of Shropshire by Moody with an external indicia of the right of disposition of the stock certificates. Any stock certificates, therefore, which were voluntarily placed in Shropshire's hands became a possible risk which must be assumed by Moody. There is, however, a second condition precedent to be shown in this case before Moody becomes liable for the wrong which may be committed by Shropshire, and that is, was the Coca-Cola stock voluntarily placed in Shropshire's hands either by design or as a result of negligence on the part of Moody. In the Russell case, supra, the plaintiff intrusted a stock certificate indorsed in blank to a fraudulent agent and he, instead of using it for the purpose for which it was intrusted to him, obtained an advance from the defendant by giving the certificate in pledge; and in such a case the true owner is estopped to assert his title as against an innocent pledgee. In the Knox case, supra, the servant simply had access to a document remaining in the possession of the owner. The evidence in the case at bar is not that the particular stock was intrusted to Shropshire, but on the contrary it is shown that Shropshire abused the faith intrusted in him and took the stock to which he had access by reason of his employment, but which had not been intrusted to him, and converted it to his own use. Such a taking can not be held to show that Moody had voluntarily surrendered possession of the Coca-Cola stock to Shropshire. Under this view of the evidence, the Fulton National Bank failed to sustain its affirmative defense and the court did not err in directing a verdict for the plaintiff.

*Judgment affirmed. Broyles, C. J., concurs. MacIntyre, J., dissents.*

MacIntyre, J., dissenting. I am in agreement with the majority, that generally, "where the owner of property, such as stock certificates, has lost it by the criminal or fraudulent act of another, the owner not voluntarily or negligently conferring upon such other the indicia of ownership or apparent title," he can not be deprived of his property by the attempted transfer of title to a third person for value, no matter how innocent the purchaser may be of knowledge of the crime or fraud by which the property was acquired. However, I can not concur in their construction and application of this principle to the case at bar. The article in dispute is a stock

certificate. While certificates of stock are not negotiable instruments in any proper sense, the courts, in view of the extensive dealings in such securities, and the interest, both of the public and of the corporations issuing them, in making them readily transferable and convertible, have largely, by application of the equitable doctrine of estoppel, clothed them with some of the characteristics of negotiable paper. 12 Fletcher's Enc. Cor. § 5477. This doctrine of equitable estoppel is stated in the Code of 1910, § 4537, as follows: "When one of two innocent persons must suffer by the act of a third person, he who put it in the power of the third to inflict the injury must bear the loss." Also § 4119: "Where an owner has given to another such evidence of the right of selling his goods as, *according to the custom of the trade or the common understanding of the world,* usually accompanies the authority of disposal, or has given the external indicia of the right of disposing of his property, a sale to an innocent purchaser divests the true owner's title." The principle cited from Fletcher, supra, and many other cases such as are cited in the majority opinion, recognize, in reference to the disposal and transfer of stock certificates, "the custom of the trade or the common understanding of the world," and have clothed them with a "quasi-negotiable" character, and apply strictly the doctrine of equitable estoppel. Stock certificates not being negotiable in the strict sense of the word, we must, in applying the doctrine of equitable estoppel, look to the phrase "according to the custom of trade and the common understanding of the world," with reference to the *right of disposal,* to determine what acts it was necessary for Moody to do in order to estop himself from claiming title to the stock in the hands of the Fulton National Bank. Accordingly, I think two things were necessary on the part of Moody: (1) the entrusting of the possession of the power of attorney to Shropshire, and (2) the entrusting of the possession of the stock certificate to Shropshire, in order to estop him from claiming title to the stock in the hands of the Fulton National Bank. The first-mentioned act is admitted by both sides, so I may pass to the question: Did Moody entrust the possession of the certificate of stock to Shropshire? In determining this it is to be kept in mind that this could have been done (1) *voluntarily* or (2) *negligently.* Did he entrust the possession of the certificate to Shropshire *voluntarily?* The agency of Mrs. Moody,

mother of the plaintiff, is admitted, so I will consider her acts as his. The evidence, including the agreed statement of facts, would possibly authorize two inferences of fact: (1) that Shropshire came into possession of the certificate by stealing it while having mere access to the safety-deposit box, and (2) that he came into possession of it when the envelope containing this certificate and the Lowry National Bank stock was handed to him by Moody, for the purpose of affecting a transfer of the Lowry National Bank stock. If the first inference is sustained, there can be no doubt, under the weight of authority, that Moody is entitled to the recovery of his stock. However, if the second inference is sustained, I can not agree that he is so entitled. It is true that it has been held that the delivery of a sealed envelope does not constitute a delivery of the articles enclosed therein (Scollans *v.* Rollins, 179 Mass. 346), and I can not say that I fully agree with this principle, in a case of the present character, yet the delivery of the envelope here *was made with authority to open it,* for it was necessary to open it in order to effectuate the purpose of its delivery, to wit: the removal of the Lowry National Bank stock. Certainly this therefore constituted a purposeful and voluntary entrusting of the contents of the envelope to Shropshire; and if he thereafter fraudulently converted the same, Moody, because he was at the time of the delivery of the stock charged with notice of the blank powers of attorney already entrusted to Shropshire, and because, "according to the custom of trade and the common understanding of the world," he was putting in Shropshire's hands the apparent power of disposal of the stock, can not now claim or assert that his acts were not such as to estop him. Certainly the law should not sanction a rule that would allow one to put it into the power of another to commit a fraud, and then turn a willing ear to a plea that he thought the party was honest and that his intention was not to so entrust the article to him. Under Moody's acts, I conceive it to be the law, that he as a matter of law entrusted the article to Shropshire, and is now estopped from claiming title thereto if the possession of the stock came about under the second inference stated.

Furthermore, in a case of this character, a delivery of possession, should certainly be a sufficient entrusting to Shropshire for one purpose, and he used it for another. Shropshire brought the

certificates to the Fulton National Bank apparently clothed with the full ownership thereof by all of the tests usually applied by business men to gain knowledge upon the subject before making the purchase of such property. Moody's trusted agent, in gross breach of his duty, whether with technical criminality or not, took such certificate with the power of attorney attached, and thus authenticated with the evidence of title, to the Fulton National Bank, and in the course of ordinary business transferred it to the bank, an innocent party. One of two innocent parties must here suffer, and the question is who shall suffer the loss? Adopting the language of the Supreme Court of the United States in the case of National Safe Deposit Saving & Trust Co. v. Hibbs, 229 U. S. 391, "In such a case we think the principles which underlie equitable estoppel place the loss upon him whose misplaced confidence has made the wrong possible."

However, I may go further and assume that Moody's acts did not amount to a voluntary entrusting of the certificate of Coca-Cola stock, yet certainly, if he came into possession of it under the second inference stated above, he was negligently entrusted with its possession. What more startling example could be thought of, of negligence, than in the present case? Moody first sends to Shropshire two blank powers of attorney executed by him, and then, without investigating what was in the envelope which he was turning over to him with power to open, he turned it over to him. True he may have trusted Shropshire; true he may have not intended to give him possession of any certificates other than the bank stock, but did not the duty evolve upon him to ascertain what stock he was putting into the possession of Shropshire, knowing that Shropshire with his (Moody's) consent already had a power of attorney which if attached to any of his stock would apparently clothe Shropshire with the full ownership thereof according to all the tests usually applied by business men under such circumstances? Will he be heard to say that his intention was not what it seemed to be, where his acts, intentional or otherwise, were sufficient under the law, "according to the custom of trade and the common knowledge of the world," to place in Shropshire's hands the power of defrauding another. I can see but one answer.

This case is distinguishable from those cases in which a servant is entrusted with a man's property with no power, expressed or

implied, of disposition. I also recognize the principle that if Shropshire had stolen the certificates endorsed in blank before it had been transferred, the owner of the stolen certificate could recover even from an innocent purchaser. This principle that when the property is stolen the owner can not be deprived of his property by an innocent purchaser "is not based on the name of the agent's crime but upon the fact that in the ordinary and typical case of theft the owner has not entrusted the agent with the document and therefore is not considered to have done enough to be estopped as against a purchaser in good faith." National Deposit Savings and Trust Co. v. Hibbs, 229 U. S. 391.

One of two innocent persons, Moody or the Fulton National Bank, must suffer a loss in this case. I can not escape the conclusion that Moody, whose misplaced confidence caused him to put it into the power of Shropshire to inflict the injury, must bear the loss. I, therefore, think the court below erred in directing a verdict for the plaintiff.