THE SAUGERTIES BANK, Appellant, v. THE DELAWARE AND HUDSON COMPANY, Respondent.

Third Department, January 20, 1923.

Bills of lading — action to recover from carrier money loaned shipper on bill of lading altered by it — property shipped on order bill stopped in transit and delivered to shipper without taking up bill of lading — shipper canceled date, inserted new date and borrowed money from bank on bill — alteration was not signed by agent of carrier — bank was chargeable with notice — forgery not proximate result of failure of carrier to take up bill on delivery of goods — carrier not liable.

A carrier of goods is not liable to a bank for money loaned by it to a shipper on an order bill of lading, where it appears that the goods were stopped in transit by the shipper and were delivered by the carrier to the shipper without taking up the original bill of lading; that thereafter the shipper canceled the date in the original bill of lading, inserted a new date, and borrowed money from the bank on the altered bill of lading, and that said alteration was not signed by an agent of the carrier issuing the bill.

The bank was chargeable with notice that the bill had been altered fraudulently and with notice of the provision contained in the bill that the carrier would not be liable except according to the original tenor of the bill where an alteration made was not signed by the agent.

While the carrier was guilty of a crime when it delivered the goods without taking up the original bill of lading and so was negligent, still the forgery was an independent wrong intervening between the negligence of the carrier and the loss of the bank and was not the direct or proximate result of the omission to take up the bill of lading and so, in the absence of any conspiracy between the shipper and the carrier to defraud the bank, the carrier is not liable.

HASBROUCK and KILEY, JJ., dissent, with opinion.

APPEAL by the plaintiff, The Saugerties Bank, from a judgment of the Supreme Court in favor of the defendant entered in the office of the clerk of the county of Albany on the 21st day of September, 1921, upon the decision of the court rendered after a trial before the court without a jury, dismissing the complaint on the merits.

*Tracey, Cooper & Townsend* [*B. Jermain Savage,* of counsel], for the appellant.

*Lewis E. Carr,* for the respondent.

VAN KIRK, J.:

The facts are stipulated. The Durant & Elmore Company in 1909 shipped by rail cargoes of grain from Buffalo, N. Y., to Portland, Me., and received bills of lading covering the shipments. The Durant & Elmore Company, who were also the consignees, stopped the grain at intermediate points and received the same without surrendering the bills of lading, and these were not canceled. The bills of lading were upon printed forms, with appropriate spaces for dating. The Durant & Elmore Company canceled and obliterated the datings and inserted new datings of April, 1910, but not in the spaces originally left therefor. These bills, so forged, were thereafter presented to the plaintiff, which loaned money thereon. The Durant & Elmore Company failed. There were no shipments of grain covered by these forged bills. The plaintiff has suffered loss and brings this action to recover from the defendant because it failed in its duty to take up the bills when the grain was delivered.

The trial court has not found, and it cannot be found on the stipulated facts, that there was any conspiracy, design or fraud participated in by defendant which in any degree contributed to plaintiff's loss, or that any act of defendant, or for which it is responsible, was willfully done. Were it possible to infer that some agent of defendant was in collusion with the Durant & Elmore Company and with intent to aid in fraud, but without the knowledge of defendant, allowed them to retain the bills of lading when they

received the grain, the defendant could not be held liable for any loss suffered by a third party through forgery of the bills and loaning money thereon. (*Friedlander* v. *Texas, etc., Railway Co.,* 130 U. S. 416.)   In that case there is a very interesting discussion of the character of bills of lading and their proper commercial uses.   The station agent of the defendant company in that action had issued a bill of lading before the receipt of the goods, and the court held that in so doing he acted outside of his authority and was not the agent of the company in the transaction.   " ' The general rule  *   *   *  is that the master is answerable for every such wrong of the servant or agent as is committed in the course of the service and for the master's benefit, though no express command or privity of the master be proved.' "   (P. 425.)   " The law can punish roguery, but cannot always protect a purchaser from loss, and so fraud perpetrated through the device of a false bill of lading may work injury to an innocent party, which cannot be redressed by a change of victim."   (P. 426.)

The bill of lading contains a provision as follows:  " Any alteration, addition or erasure in this bill of lading which shall be made without an indorsement thereof hereon, signed by the agent of the carrier issuing this bill of lading, shall be without effect, and this bill of lading shall be enforceable according to its original tenor." Webster's International Dictionary defines " tenor " as follows: " Law. An exact copy of a writing, set forth in the words and figures of it.   Setting forth a document according to its tenor necessitates giving an exact copy of it, as distinguished from setting it forth according to its purport and effect." Any alteration is here absolutely forbidden, except it be indorsed over the signature of the agent of the carrier, and any erasure without such indorsement is without effect; the bill of lading is available only as it stood before the alteration.   Without the alteration in this case the dates of the bills would certainly have put the bank upon inquiry, or it itself would have been guilty of negligence.   Bills of lading can be issued only when the goods are actually received by the carrier, when transportation is about to begin.   (*Friedlander Case,* *supra,* 424.)   The alteration of these bills was plainly discernible. The date spaces were covered by cancellation marks, and the new dating was not in the natural place, and the alteration was not an indorsement signed by the agent of the carrier.   The plaintiff was called upon to challenge the bill.

The defendant was guilty of crime when it delivered the goods without taking up the bills of lading, and so was negligent; but there is nothing in the record showing that it had reason to believe that the Durant & Elmore Company contemplated using any spent

bills through forgery. The defendant is in no wise connected with the forgery and no inference can be drawn that the railroad company, when it failed to take up the bills of lading, should have anticipated that the consignee would commit a crime in connection therewith, and so wrongfully procure funds. The forgery was an independent wrong intervening between the negligence of the defendant and the loss of the plaintiff. It was not the direct or proximate result of the omission to take up the bills of lading. There are not in this case two proximate causes of damage; given the negligence without the subsequent forgery no loss would have occurred. The plaintiff accepted these spent bills of lading which had been forged, and advanced moneys thereon without detecting the forgery. (*Mairs* v. *Baltimore & Ohio R. R. Co.*, 175 N. Y. 409.) In that case a non-negotiable bill of lading had been issued, but without the word " non-negotiable " stamped on the face thereof. The cargo was delivered without taking up the bill of lading which the consignor altered by inserting the words " order of and notify," thus making the bill negotiable, and pledged it as collateral. It also appeared that the plaintiff was acquainted with the nature of bills of lading and their commercial uses. The court said: " It is, therefore, apparent that the plaintiff could not have been induced to part with any property or make loans upon this bill of lading had it remained in the form in which it was originally executed. He was induced to take it for the reason that it appeared to be negotiable. He was deceived by reason of the forgery and for this the defendants were not responsible. The forgery was not the direct or proximate result of the omission to take up the bill of lading, but was the independent and felonious act of another person. For this reason we think the plaintiff cannot recover." Without an inference that there was a conspiracy between the consignor and the defendant, a concerted design to defraud by using these bills of lading when forged, we are unable to distinguish the *Mairs* case from the case at bar.

It was suggested by one of the counsel on the argument, and was not questioned by his adversary, that the Durant & Elmore Company up to the time of their failure was understood to be composed of business men of character and financial responsibility. This fact suggests a plausible reason why both the plaintiff and the defendant were less careful in their transactions with that firm than they otherwise would have been. This grain was consigned by the Durant & Elmore Company to itself. The destination had been changed. There was nothing suggestive of doubt when the consignee asked from this defendant the grain which it had shipped to itself. The plaintiff bank, knowing the standing of the company,

would not suspect that it would present a forged bill as a collateral for a loan. We do not appreciate how any moral responsibility under the facts in this case rests more heavily upon the railroad company than upon the bank. If an individual had suffered because the bank had failed to detect a forgery the responsibility would rest upon the bank. Why should it not be responsible when it itself has suffered?

The judgment dismissing the complaint should be affirmed, with costs.

H. T. KELLOGG, Acting P. J., and HINMAN, J., concur; HAS-BROUCK, J., dissents, with an opinion in which KILEY, J., concurs.

HASBROUCK, J. (dissenting):

This is an appeal by the plaintiff from the judgment entered upon the decision of Mr. Justice ROSCH dismissing the plaintiff's complaint, with costs, on September 21, 1921.

The Durant & Elmore Company, a corporation engaged in the grain and feed business at Albany, N. Y., during the year 1909 contracted with the Delaware, Lackawanna and Western Railroad Company, the New York, New Haven and Hartford Railroad Company, the Lehigh Valley Railroad Company, the Baltimore and Ohio Railroad Company and the Chesapeake and Ohio Railroad Company, for the transportation of certain cargoes of grain as specified in the schedule of the complaint from Buffalo, N. Y., to Portland, Me. The evidences of such contracts were certain bills of lading providing for carriage with safety and reasonable dispatch, etc. Consignments were made according to the said schedule, the Durant & Elmore Company being the consignor and named in the bills as consignee.

The voyages of these consignments were not completed by original carriers but were widened by the offices of the defendant to such end that when such consignments reached Oneonta the voyages were terminated by the demand of the consignee and the delivery of the property, by the carrier, the defendant, to the consignee. It seems that the transactions between the defendant and the Durant & Elmore Company so far as they related to these cargoes were complete. The defendant, however, neglected in all of these consignments to take up the bills of lading which covered them. There were twenty-two different carload lots covered by as many bills of lading. The defendant committed as many separate crimes as it made deliveries without requiring the surrender of the bills (Penal Code, § 633), and with the Durant & Elmore Company forgery was an occupation.

The defendant left these bills of lading in the hands of the Durant

& Elmore Company. They contained a provision: " The surrender of this original order bill of lading properly indorsed shall be required before the delivery of the property."

The Durant & Elmore Company having become financially distressed became desperate and changed the dates on these bills so as to make them of April, 1910, and applied for a loan to the plaintiff and that bank on the faith of such bills of lading given as collateral loaned that company $15,000. Shortly after securing the loan the Durant & Elmore Company became insolvent and went into the hands of receivers. The bank has been paid upon the loan $4,800 and there has been realized from the sale of collateral $949.94, so that the claim of the bank amounted to $9,550.06, with interest as stated in the complaint.

The gravamen of the complaint is that the defendant having issued a contract breached it by negligently failing to require the surrender of the bills of lading before delivering the property, and that thereby plaintiff was deprived of its security covered by defendant's bill of lading.

These bills of lading contained a further provision which reads as follows: " 10. Any alteration, addition or erasure in this bill of lading which shall be made without an indorsement thereof hereon, signed by the agent of the carrier issuing this bill of lading, shall be without effect, and this bill of lading shall be enforceable according to its original tenor."

If the plaintiff possesses a right of recovery on the above facts it hangs upon the force and effect of the above-quoted provision.

This is an action on the case involving the wrong of delivering the cargoes without requiring the surrender of the bills of lading. (*Van Pelt* v. *McGraw*, 4 N. Y. 110, 112.)

The defendant admits the acts of delivery without requiring the bills and admits that such acts constitute crimes. The commission of the crimes of leaving the bills in the hands of the Durant & Elmore Company rendered possible the commission of other crimes by officers or employees of that company, viz., forgeries, the alterations of the dates on the bills and the utterances of them.

These bills of lading had the power by indorsement thereon of the consignee to transfer title to the properties described therein and were for that reason under the law merchant negotiable. Not absolutely like promissory notes and bills of exchange, but in a limited way. (*Pollard* v. *Vinton*, 105 U. S. 7; *Colgate* v. *Pennsylvania Co.*, 102 N. Y. 120.) Regarding this feature of negotiability our Court of Appeals has said and its applicability to the case at bar should not be doubted: " The principle of negotiability is * * * in its being transferable by indorsement and delivery, or by

delivery merely. To import into the general rule a term, or an element of duty, which requires of a purchaser, taking in good faith and for value, that he investigate the *bona fides*, or the title, of previous holders in the chain of title, would be inconsistent with the feature, or quality, of negotiability. * * * In the present case the bonds were payable to any one who took them in good faith; because his authority to fill in the name of the payee was derived * * * from the city of Yonkers, which, as maker, sent them forth with a general warrant to any *bona fide* holder to make himself their payee." (*Manhattan Savings Inst.* v. *N. Y. Nat. Exch. Bank,* 170 N. Y. 65.)

The point of similarity between these bonds and the bills of lading is that the holders or possessors of them were under no duty of investigation as to the bills but had a right to rely upon the character of negotiability their authors gave them. The bonds passed by delivery because of no restriction appearing on their face to the payee. The bills of lading here because of no limitation on their face restricting their transferability. On the contrary, there were words to facilitate it.

We assert that the negotiability with which these bills are claimed to be affected arises out of the fact that the bills themselves run to the order of the consignee and that the law merchant confers such quality upon them. Indeed the quality of negotiability is fixed upon such bills as do not carry the words " not negotiable." (Penal Code, § 633; Penal Law, § 365.) It was the purpose of the uniform bill of lading as approved by the Interstate Commerce Commission that it should be negotiable. (Interstate Commerce Commission Reports, vol. 14, p. 348. Interstate Commerce Commission Reports, vol. 21, p. 13.) Indeed negotiability is conceded among the stipulated facts.

With these bills characterized by negotiability, limited though it be, no authority occurs to me which allows the maker to challenge their validity in the hands of a *bona fide* holder.

The defendant stands upon the proposition that the bills were spent and that the transferors could confer on the transferees no greater title than they possessed. (*Shaw* v. *R. R. Co.,* 101 U. S. 557; *Pere Marquette Ry.* v. *French & Co.,* 254 id. 544; *New York Cent. & H. R. R. R. Co.* v. *Bank of Holly Springs,* 236 Fed. Rep. 562; *Mairs* v. *Baltimore & Ohio R. R. Co.,* 175 N. Y. 409.)

The plaintiff has no quarrel with the fact found that the bills are spent nor with the principle of law that the transferor can confer no greater title than he possesses. The claim presented here rests upon a doctrine quite different. The case of the plaintiff is that the defendant, having negligently failed twenty-two times to

require the surrender of a bill of lading, placed the Durant & Elmore Company in the ostensible position of true owners, thereby conferring the power on such company to deceive and mislead plaintiff into making loans on spent and fictitious bills.

It is the boast of English and American jurisprudence that it is so broad and so comprehensive in its application to human needs that it affords a remedy where there is a right to be vindicated or a wrong to be corrected. It is but a boast; too frequently it is not the truth. That the plaintiff has been grossly imposed upon is admitted, but the remedy is denied by the defendant.

We think there is a remedy and that it is based on the principle of estoppel. Judge RAPALLO, writing for the Court of Appeals, said: " It must be conceded that as a general rule, applicable to property other than negotiable securities, the vendor or pledgor can convey no greater right or title than he has. But this is a truism, predicable of a simple transfer from one party to another where no other element intervenes. It does not interfere with the well-established principle that where the true owner holds out another, or allows him to appear, as the owner of, or as having full power of disposition over the property, and innocent third parties are thus led into dealing with such apparent owner, they will be protected." (*McNeil* v. *Tenth National Bank*, 46 N. Y. 329.)

The doctrine has been acceded to by the United States Supreme Court in *Shaw* v. *R. R. Co.* (101 U. S. 565). Mr. Justice STRONG writes: " It may be that the true owner by his negligence or carelessness may have put it in the power of a finder or thief to occupy ostensibly the position of a true owner, and his carelessness may estop him from asserting his right against a purchaser who has been misled to his hurt by that carelessness." Chief Justice FULLER quotes this principle of estoppel as applicable to bills of lading with approval in *Friedlander* v. *Texas, etc., Railway Co.* (130 U. S. 424).

It seems to me that the case presented by the learned Mr. Justice STRONG is the case at bar. *Walters* v. *Western & Atlantic R. Co.* (56 Fed. Rep. 369) is directly in point. In that case the court said: " If this company [the railroad company] did not, both by its action and nonaction, put it in the power of Akers & Bro. to perpetrate a fraud upon innocent persons, it would be difficult to imagine a case where the rule on that subject, as expressed in the foregoing quotation, would apply." The principle invoked is not new.

In *Cairncross* v. *Lorimer* (123 Eng. Rev. Rep. 908), Lord CAMPBELL, Lord Chancellor, said: " The doctrine will apply, which is to be found, I believe, in the laws of all civilized nations, that if a

man either by words or by conduct, has intimated that he consents to an act which has been done, and that he will offer no opposition to it, although it could not have been lawfully done without his consent, and he thereby induces others to do that from which they otherwise might have abstained, he cannot question the legality of the act he had so sanctioned, to the prejudice of those who have so given faith to his words, or to the fair inference to be drawn from his conduct." He further says: "If a party has an interest to prevent an act being done, and acquiesces in it, so as to induce a reasonable belief that he consents to it, and the position of others is altered by their giving credit to his sincerity, he has no more right to challenge the act to their prejudice than he would have had if it had been done by his previous license." (*Paxson* v. *Brown*, 61 Fed. Rep. 882; *Fisher* v. *Mechanics & Metals National Bank*, 89 Misc. Rep. 587; *Brooke* v. *New York, Lake Erie & W. R. R. Co.*, 108 Penn. St. 544. See, also, *First National Bank* v. *N. Y. C. & H. R. R. R. Co.*, 85 Hun, 160; *National Exchange Bank* v. *Lester*, 194 N. Y. 468.)

The same principle is involved in the law of negligence where a party allows a dangerous instrument or substance to go without warning into the hands of an innocent purchaser. (*Henry* v. *Crook*, 202 App. Div. 19; *MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382.)

It is available too for the plaintiff to invoke that other rule of estoppel and legal maxim which points to responsibility. Where one of two innocent parties must sustain a loss from the fraud of a third, such loss should fall upon the one, if either, whose act has enabled such fraud to be committed. (*Fisher* v. *Mechanics & Metals National Bank, supra; Moore* v. *Metropolitan National Bank*, 55 N. Y. 46; *Brooke* v. *New York, Lake Erie & W. R. R. Co., supra.*)

Notwithstanding the soundness and applicability to the case at bar of the principle of estoppel, there can be no recovery in this case unless it can be distinguished from the case of *Mairs* v. *Baltimore & Ohio R. R. Co.* (*supra*). The bills of lading are entirely different, the main difference being that in the *Mairs* case there was no provision similar to condition No. 10 found in the bills of lading upon which this action is based. That condition was not inserted for the protection of the carriers, for the carriers could not be bound by an agreement they did not make by an alteration, erasure or addition placed upon their bills without their sanction. The carriers knew how open and subject to fraudulent practices these bills of lading were (*Colgate* v. *Pennsylvania Co., supra*), and to inspire and invite the confidence of bankers to loan upon

and the commercial world to deal in and receive these bills of lading there was placed in them provision No. 10.

Can there be any doubt that the carriers had the right to make such an agreement? Has such an agreement any quality different from that of insurance against theft or arson? The effort then of such an agreement upon the part of the defendant was to emphasize the soundness of such bills as business documents and to divest itself of the right to defend against such bills of lading on the ground that they had been altered or forged. " It supposes a contingency and provides for its occurrence." (*Michigan Central R. R.* v. *Mark Owen & Co.*, 256 U. S. 431.) Having said to the plaintiff, invest in this bill, it is good for the property it originally stood for, it should not upon any grounds I know of now be permitted to repudiate that agreement.

This distinction between the case at bar and the *Mairs* case being established, the *Mairs* case becomes authority to support the plaintiff upon the proposition that if the forgery had not exculpated the railroad company it would have been liable for its participation in the fraud practiced upon Mairs.

The defendant claims that even though divested of forgery as a defense the bills of lading were only enforceable according to their original tenor which was of bills dated five or six months before their negotiation; that in their original shape as spent and stale bills plaintiff would not have loaned upon them. We cannot admit that claim. The bills at origin in their original tenor were neither spent nor stale. This claim, however, involving what is meant by original tenor falls far short of shielding the defendant from liability; first because having been guilty of breaking its contract and of violating the criminal law in failing to require a surrender of the bills of lading it is responsible for all the proximate consequences of its illegal act whether such consequences were natural or not. (Sedg. Dam. [9th ed.] § 143; *Kentucky Heating Co.* v. *Hood*, 133 Ky. 383; 134 Am. St. Rep. 457; *Cowan* v. *Western Union Tel. Co.*, 122 Iowa, 379; *Vosburg* v. *Putney*, 80 Wis. 523; 1 Add. Torts, 43.)

There can be no question that among the anticipated consequences of the defendant's crime was the change of the date on the bills, for such acts are anticipated by condition 10 of the bills. There must too be anticipated the general tendency of the reckless and needy to tamper with and commit fraud through their instrumentality. (*Colgate* v. *Pennsylvania Co.*, *supra.*) In that case Judge Finch said: " The appellant argues that the act does not forbid delivery to the consignee where that delivery is stipulated, but aims only to protect against ' spent bills,' or such as exist

after delivery, and so are susceptible of a wrongful or fraudulent use. Doubtless the last was one of the evils sought to be prevented, but that purpose could only be effectually accomplished by forbidding a delivery, except accompanied by a cancellation of the bill. By no other mode could the existence of ' spent bills ' in a form capable of deception be prevented; for, if the carrier could deliver to the consignee without cancellation, the bill of lading would be left outstanding as a possible basis of fraud."

In the light of this language the defendant must be held to have anticipated as one of the consequences of its crime the fraudulent use of the bills. That use was just the use that the Durant & Elmore Company made of them in twenty-two instances. This point was not urged or passed upon in the *Mairs* case; *non constat* that if it had been the decision would have been otherwise.

If the efficacy of the above rule might be doubted still the plaintiff could maintain itself on the agreement contained in condition 10, that the bills were enforceable according to their " original tenor." The bills perform a twofold office. They constitute a receipt for property and an agreement to carry and to deliver such property upon the surrender of the bill. The basic meaning of " tenor " is in " tenere — to hold." The reading of the bill should be in effect original holding. This is the significance the lexicographers have given it. Original " tenor " as defined signifies original " true intent and meaning; " original " purport and effect; as the tenor of a deed or instrument of any kind is its purport or effect, but not its actual words." (Century Dictionary, vol. 9, p. 6233; *Town Council* v. *Union National Bank*, 22 So. Rep. 291.)

The words " original tenor " are used in the text of the bills in connection with the word " enforceable." The bills do not provide that they are non-enforceable because of alteration but " enforceable " not in accordance with the actual words describing dates, routes, cooperage, etc., but according to purport and effect as *sound good bills* calling for the delivery of cargoes. Brother VAN KIRK undertakes to give the word " tenor " its meaning in the law, as used in reference to indictments and criminal pleadings. Such an interpretation would be proper where technical precision might be required, but when used in trade and business such a meaning would constitute, instead of a help, an imposition. Such words must be interpreted too according to the rule laid down by the courts: " Language is to be construed according to its ordinary meaning and not in a technical or artificial sense." (*Clark* v. *N. Y. Life Ins. & Trust Co.*, 64 N. Y. 39.) Any other interpretation of the words " original tenor " would divest the agreement of its substance and convert it into a snare instead of a shield. To say

that the bills are enforceable according to their original tenor and then to deny it is " a mere juggling with words." (*Knights of Pythias* v. *Withers*, 177 U. S. 267; *Steuernagel* v. *Supreme Council of R. A.*, 234 N. Y. 260.)

Divested of defense on account of the forgeries of the Durant & Elmore Company it seems that defendant must shoulder the consequences of its wrong and fraud upon the plaintiff.

In the *Mairs* case the forgery was held to be the proximate cause of plaintiff's injury. In this case the claim of forgery as a weapon of defense has been stipulated away by the defendant. It may remain as a wrong but defendant can have no advantage of it. Then as between plaintiff and defendant the proximate cause of plaintiff's injury is the failure to take up and cancel the bills. The plaintiff was wronged by defendant's crime; it was wronged by the forgeries of the Durant & Elmore Company. The neglect to take up the bills and the change made in their dates were co-operating and concurring causes which made the deceit and fraud practiced upon the plaintiff possible. Whether the defendant be responsible for both of these causes or but for one alone it is liable for all the damages suffered by the plaintiff. The late Judge GRAY, writing for our Court of Appeals, said: " There may be more than one proximate cause of an accident, if each of the causes asserted can be seen to have been an efficient one, without which the injury resulting would not have been sustained. If the negligent acts of two, or more, persons concur in contributing to an accident, the injured person may hold them, jointly and severally, liable. Where concurrence in causes is charged, the test is, simply, could the accident have happened without their co-operation? " (*Sweet* v. *Perkins*, 196 N. Y. 485; *Ring* v. *City of Cohoes*, 77 id. 83; *Leeds* v. *N. Y. Telephone Co.*, 178 id. 118; *Rompillon* v. *Abbott*, 1 N. Y. Supp. 662; *Henry* v. *Dennis*, 93 Ind. 453; 47 Am. Rep. 378 and notes; S. & R. Neg. [6th ed.] §§ 31, 32.)

The judgment should be reversed and judgment rendered for the plaintiff in accordance with the demand of the complaint, with costs and disbursements on the trial and in this court.

KILEY, J., concurs.

Judgment affirmed, with costs.